UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

IN RE:

    JOHN M. MANSOUR,                                     Case No. 08-30529-dof
                                                                         Chapter 7 Proceeding
            Debtor.                                              Hon. Daniel S. Opperman
_____/

THE STATE BANK,

    Plaintiff,

v.                                                                                     Adversary Proceeding
                                                                                     Case No. 08-3096-dof

JOHN M. MANSOUR,

    Defendant.
_____/

Trial Opinion

Findings of Fact

        Plaintiff, The State Bank, lent money to various business enterprises owned or controlled by the Defendant, John M. Mansour, for many years. Two of these loans, a line of credit extended by Plaintiff to J.M. Developments, Inc. in the amount of $500,000, and a construction loan extended by Plaintiff to Landings at Crane's Cove, L.L.C. in the amount of $2,405,000, are the subject matter of this litigation. Defendant guaranteed both obligations because of his ownership interest in each borrower.

        In August, 2007, Defendant submitted a personal financial statement to Plaintiff. This personal financial statement was part of a number of documents and other pieces of information Plaintiff used to analyze its loans and determine future courses of action. The submission of these financial statements, as well as the events from August, 2007, through February, 2008, form the basis of this lawsuit.

1

By way of background, Defendant is a Genesee County native and graduated from Georgetown University with a degree in accounting. After a few years of working with various accounting firms and businesses, the Defendant returned to Genesee County and joined a real estate development business owned by his father and uncle. Defendant then established J.M. Developments, Inc., as well as a number of other companies for the purpose of developing real estate in southeastern Michigan. Because of Mr. Mansour's education, background, and general knowledge of business, Plaintiff invited him to join Plaintiff's board of directors in 2003. Defendant served on the board of directors until May, 2005. While serving as a member of the board of directors, Defendant learned of the procedures utilized by Plaintiff in analyzing credits.

One of the two obligations in question is a line of credit in the amount of $500,000 extended by Plaintiff to J.M. Developments, Inc. This line of credit was to allow J.M. Developments, Inc. the ability to fund day to day expenses, as well as to acquire real estate and to pay payroll costs. Defendant guaranteed this obligation by execution of a commercial guarantee admitted as Exhibit 3. Under the line of credit agreement, J.M. Developments, Inc. was to make interest payments and was set to mature on December 20, 2007.

The second obligation in question is a $2,405,000 construction loan extended by Plaintiff to Landings at Crane's Cove, L.L.C. Monthly payments on the construction loan were likewise required with a maturity date of March 25, 2008. The Defendant guaranteed this obligation by virtue of a personal guarantee admitted as Exhibit 10.[1]

---

[1] Exhibit 10 required Defendant to submit an annual statement no later than 120 days after the end of each fiscal year and further required that all financial reports were to be prepared in accordance with GAAP. In contrast, the guarantee for J.M. Developments, Inc. does not contain this specific language.

Beginning as early as 2006, Plaintiff was concerned about the ability of Defendant and Defendant's business enterprises to continue operations. Much of Plaintiff's concern was based upon the general decline in economic activity in the State of Michigan, particularly in regard to residential real estate. As early as December, 2006, an internal dispute between and among various officers of Plaintiff ensued as to the correct course to take in regard to Defendant and his business operations. In particular, Donald Grill expressed a lack of confidence of Defendant remaining viable. In contrast, Jeffrey Langs, the senior credit officer of Plaintiff and the person in charge of Defendant's accounts, had more confidence.

In August, 2007, Mr. Langs received a personal financial statement from Defendant. This financial statement, admitted as Exhibit 19, gave details of Defendant's holdings, as well as his obligations. In this statement, Defendant summarized his interest in various real estate projects and based the values placed in this financial statement on appraisals anywhere from one to two years old.

Defendant did not disclose a gambling debt owed to Greektown Casino in the amount of $65,000 incurred by Defendant from 2000 through 2005. By December, 2005, Defendant informed Greektown Casino that he was not able to pay the approximate $90,000 balance owed to Greektown Casino and made arrangements to pay $20,000 to Greektown Casino in December, 2005, with a promise to pay the remainder by January, 2006. Defendant was not able to pay this obligation in January, 2006, and then entered into negotiations to pay this obligation in installments. Defendant made some payments on the installment arrangements with Greektown Casino, but owed $65,500 to Greektown Casino at the approximate time that he submitted the personal financial statement to Plaintiff. By all accounts, Defendant's statements in regard to Greektown Casino were and are incorrect in that Defendant never advised Plaintiff of his obligation to Greektown Casino either in writing or orally until after Defendant filed bankruptcy.

Mr. Langs took the personal financial statement and, along with other personnel of Plaintiff, analyzed it, as well as other information gathered by Plaintiff including Defendant's credit report. From August, 2007, through December, 2007, Plaintiff received sporadic late payment of the monthly obligations owed by J.M. Developments, Inc. and Landings at Crane's Cove, L.L.C. The payment history for each entity can be best summarized by the following chart:

J.M. Developments, Inc.

| *Due Date* | *Date Paid* | *Days Late* |
|---|---|---|
| 08/20/07 | 08/28/07 | 8 |
| 09/20/07 | 10/03/07 | 13 |
| 10/20/07 | 10/30/07 | 10 |

Landings at Crane's Cove, L.L.C.

| *Due Date* | *Date Paid* | *Days Late* |
|---|---|---|
| 08/25/07 | 08/28/07 | 3 |
| 09/25/07 | 10/03/07 | 8 |
| 10/25/07 | 10/30/07 | 5 |

Each of the late payments constitutes an event of default as defined by the loan documents, but Plaintiff did not exercise any rights as a result of these late payments.

The reason for the failure of Plaintiff to exercise its rights was best explained by David M. Hendry, the Head of Special Assets and Collection for Plaintiff. As Mr. Hendry testified at the trial on February 16, 2010:

> Q   In your capacity at The State Bank as a general matter, are you also aware that payments on the Landings construction loan agreement throughout August, September, and October of 2007 were made late?
> A   Yes.
> Q   Okay. So when a late payment was made for example on JMI - -
> A   Correct.
> Q   Would that be an event of default under JMI?

4

|   |   |
|---|---|
| A | Yes. |
| Q | And because these two credit facilities at least after the execution of Exhibit 51 are cross defaulting, is an event of default under JMI also an event of default under Landings? |
| A | Yes. |
| Q | And visa versa, correct? |
| A | Correct. |

(Tr. at 99, Lines 8 - 23).

|   |   |
|---|---|
| Q | Okay. Here is the question to you, sir. If these two credit facilities are cross defaulting, at least after the execution of Exhibit 51, and there are multiple events of default on both credit facilities due to late made payments after August, September, and October of 2007, okay? |
| A | Okay. |
| Q | Why did The State Bank tolerate all of these multiple events of default after August of 2007? |
| A | Having been a member of various loan committees involved with the ongoing approvals of JMI and Landings, the information related to us, meaning John Mansour's personal financial statement, as well as any other information that might have been contained within the loan presentation, as well as the loan officer Jeff Langs' personal comments or reviews of his relationship with John Mansour and those entities, there was a continued theme throughout that we could rely upon the net worth, the statements that John had made that he would be good for his guarantee and he would make good on those debts throughout that period. And that's what we would have relied on. |
| Q | So just so that I understand, The State Bank tolerated these multiple events of default of these cross defaulting credit facilities because it relied on his August 2007 personal financial statement? |
| A | Correct. |

(Tr. at 100-01, Lines 10 - 25, 1 - 9).

|   |   |
|---|---|
| Q | Okay. Now if I represented to you that there were events of default throughout August, September, and October of 2007 on both JMI and Landings - - |
| A | Yes. |
| Q | Upon the first event of default in August of 2007 on JMI, could The State Bank have sued John Mansour? |
| A | Yes. |
| Q | Did it? |
| A | No. |
| Q | Why? |
| A | We relied on the information again in his personal financial statement to provide a source of repayment for the debt along with his statements |

5

provided to Jeff and to the committees that he would be good for it and he would stand up to - - to make us right and paying off the debt.

(Tr. at 107, Lines 11 - 25).

> Q    So The State Bank did not sue him, John Mansour that is, for default for the late payment on JMI in August of 2007?
> A    No.
> Q    But it could have?
> A    It could have.
> Q    Okay. What about a late payment in September of 2007 that JMI made?
> A    Same answer, it could have.
> Q    What?
> A    It could have.
> Q    Did it?
> A    No.
> Q    Why?
> A    Again we relied on the information in his personal financial statement which was his net worth as well as the statements he had made in meetings with Jeff and indicating that he would be good for the debt as a guarantor and a grantor.
> Q    If there was an event of default in October of 2007 on the JMI line, what could The State Bank have done then?
> A    We could have sued John personally.
> Q    Did you?
> A    No.
> Q    Why?
> A    Again we relied on the fact that there was a game plan out there. He had indicated to Jeff and to us later that he would be able to market the property and be good for it and stand up to the deficiency.
> Q    Now going over to Landings. Because these credit facilities are cross defaulting, if there's an event of default on JMI in August of 2007, is there also an event of default on Landings?
> A    Yes.
> Q    In August of 2007, did The State Bank sue John Mansour?
> A    No.
> Q    Did it?
> A    No.
> Q    Why?
> A    Again we relied on the information that was contained in his personal financial statement which indicated the fair net worth. We relied on his statements that he was good for it. And we - - we figured that there was a game plan that he had provided that would allow us to reduce our - - mitigate our loss or exposure if there were one.
> Q    That is for Landings in August. What about Landings in September, event of default occurred on Landings in September of 2007. Did The State Bank

6

| | |
|---|---|
| | sue John Mansour then? |
| A | No. |
| Q | Could it have? |
| A | Yes. |
| Q | Why did it not? |
| A | Again we relied on the information in the personal financial statement. His statements that he was good for it, and - - |
| Q | October of 2007, Landings default. Could The State Bank have sued John Mansour then? |
| A | Yes. |
| Q | Did it? |
| A | No. |
| Q | Why? |
| A | Again the same answer. Reliance upon the information provided in the personal financial statement as well as his own personal statements to us. |

(Tr. at 108-10, Lines 1- 25, 1 - 25, 1 - 13).

On December 6, 2007, Defendant met with various officers and employees of Plaintiff. The first part of this meeting was devoted to the Landings at Crane's Cove, L.L.C. and included Mr. Rockman, an associate of Defendant in this enterprise. At the meeting, the various individuals discussed the general nature of the economic climate in Michigan and the impact of that climate on residential real estate development in southeastern Michigan. The second part of the meeting excluded Mr. Rockman and was devoted to Defendant's financial standing, especially in regard to the guarantees of J.M. Developments, Inc. and Landings at Crane's Cove, L.L.C. As a result of this meeting, in which Mr. Mansour reaffirmed the statements in the August, 2007, personal financial statements, Mr. Langs concluded that the maturation date of the $500,000 line of credit should be renewed to match the March, 2008, maturation date of the $2,405,000 construction loan. At the February 9, 2010, trial, Mr. Langs testified as follows as to his reasons for his actions:

| | |
|---|---|
| Q | What was your recommendation that The State Bank do with regard to the expiring or maturing JMI line after the December 6, 2007 meeting? |
| A | My recommendation as senior credit officer and loan officer was to extend the line of credit until March 20, 2008 to match the maturing Landings at Crane's Cove obligation. |
| Q | And why did you make that recommendation? Why did you in your position |

7

>   and based on your experience and based on your relationship with Mr. Mansour, why did you recommend that the bank extend the maturation date of the JMI line after the December 6, 2007 meeting?
>
> A   Based on our conversations that there was a game plan for each project. John had worked with me for a number of years and I believed that his statements and game plan was that he was going to stand beside the line of credit and make good on the obligation.

(Tr. at 133, Lines 1 - 16).

> Q   . . . Exhibit No. 19 you've already said does not have any gambling related liabilities to for example Greektown.
> A   Yes.
> Q   I'm going to ask this of you as a hypothetical for now, okay? Hypothetically if when you made your recommendation as set forth in Exhibit No. 20, that the maturation date for JMI be extended to coincide with the maturation date for Landings out until March of 2008, if at the time you made your recommendation that personal financial statement, that Exhibit No. 19 would have included a liability to Greektown Casino that Mr. Mansour had advised the casino he could not pay, if you would have known that, what if anything would have changed about your recommendation?
> A   Well, I'd certainly have to, you know, consider that particularly if the statement was made that the obligation could not be paid. That might be an indication of the intent to pay other obligations that were coming due not only to us but other creditors.
> Q   Not only the intent to repay those obligations, but what about the ability to repay those other obligations, correct?
> A   Absolutely.
> Q   Why? Explain.
> A   Well, again it would be part of the cash flow of the business and the personal - - personal cash flow of the - - of the individual involved.

(Tr. at 136-37, Lines 21 - 25, Lines 1 - 21).

As noted by Plaintiff in its brief, the spector of a bankruptcy filing by Defendant or some of his business entities was contemplated by the parties, but not discussed directly. At any rate, Defendant filed a petition seeking relief under Chapter 7 of the Bankruptcy Code on February 13, 2008.

Plaintiff brought the instant complaint seeking exception from discharge of the obligations guaranteed by Defendant to it asserting causes of action under 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), § 523(a)(4), and § 523(a)(6).

8

Statement of Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), as this is a determination as to the dischargeability of particular debts.

Applicable Statute

11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B) state:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt —
> . . .
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> (B) use of a statement in writing —
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive; or. . .
> . . .

Section 523(a)(2)(A) & (B)

To prevail on a claim under 523(a)(2)(A), a plaintiff must show that:

> (1) [T]he debtor obtained money through a material misrepresentation that at the time the debtor knew was false or that he made with reckless disregard for the truth; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*In re Rembert,* 141 F.3d 277, 280 (6th Cir. 1998). Whether a debtor possessed intent to deceive is measured by a subjective standard. *Id.*

The purpose of section 523(a)(2) is to prevent debtors from retaining the benefits of property obtained through fraud. *In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994). Plaintiff

9

must show each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Even so, the court must construe all of the exceptions to discharge strictly, and must give the benefit of the doubt to debtor. *Rembert,* 141 F.3d at 281.

Section 523(a)(2)(B) excepts from discharge debts incurred by use of a false statement in writing. To prevail on a § 523(a)(2)(B) claim, a plaintiff must establish the following elements regarding the writing:

> (i) that it is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive.

*See Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985). A document that is "written, signed, adopted or used by the debtor" qualifies as a statement in writing under this section. *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001).

Under the first element, a written statement is materially false if the information in it "offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit." *Id.*, *citing In re Bogstad*, 779 F.2d 370,375 (7th Cir. 1985).

The second element requires that the statement refer to the debtor's financial condition.

The third element requires the plaintiff/creditor to establish reasonable reliance on the written statement. Reasonable reliance is not defined in the Bankruptcy Code. Case law generally holds that it is determined objectively based on the totality of the circumstances. *In re Michael,* 265 B.R. at 598.

> The determination of the reasonableness of the creditor's reliance on a false statement in writing is judged by utilizing such factors as:
> whether there had been previous business dealings between the debtor and the creditor;
> whether there were any warnings that would alert a reasonably prudent person to the

debtor's misrepresentations;

whether a minimal investigation would have uncovered the inaccuracies in the debtor's financial statements; and

the creditor's standard practices in evaluating creditworthiness and the standards or customs of the creditor's industry in evaluating creditworthiness.

*Id.*

The fourth element requires that the debtor make or publish the statement with "intent to deceive."

> The standard. . . is that if the debtor either intended to deceive the Bank or acted with gross recklessness, full discharge will be denied. . . . That is, the debtor must have been under some duty to provide the creditor with his financial statement; but full discharge may be disallowed if the debtor either intended the statement to be false, or the statement was grossly reckless as to its truth.

*Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985)(citations omitted).

## Analysis

As developed in the trial of this matter, Plaintiff relies specifically on the August, 2007, personal financial statement given to it by Defendant and Defendant's periodic reaffirmation of that personal financial statement throughout the remainder of 2007. After reviewing the exhibits and the trial testimony in this case, the Court concludes that Plaintiff was unable to show any other instances of false statements that would constitute material misrepresentations by way of false pretenses, false representation, or actual fraud other than the August, 2007, personal financial statement respecting the Debtor's financial conditions and Defendant's periodic reaffirmation of that statement. 11 U.S.C. § 523(a)(2)(A) specifically excludes a statement respecting a debtor's financial condition, so by statute the Court cannot consider these statements for the 11 U.S.C. 523(a)(2)(A) claim. In this case, all of Plaintiff's proofs are based on Defendant's statements regarding his financial condition. Accordingly, the Court dismisses Plaintiff's Complaint as to all claims under 11 U.S.C.

§ 523(a)(2)(A) and will analyze this financial statement under 11 U.S.C. § 523(a)(2)(B), as that sub-section is directly applicable.

As to Plaintiff's 11 U.S.C. § 523(a)(2)(B) action, it is undisputed that the August, 2007, personal financial statement is in writing respecting the Debtor's financial condition. The remaining issues for analysis under this sub-section, therefore, are whether the August, 2007, personal financial statement is materially false, whether the Plaintiff reasonably relied on the statement, and whether the Debtor caused to be made or published the statement with an intention to deceive.

The two aspects of the August, 2007, personal financial statement that the Plaintiff claims to be false are in regard to the Defendant's statements of the value of his real estate holdings and the failure to disclose the Greektown Casino debt. As to the value of the Defendant's real estate financial holdings, the Court concludes that his statements were improperly based upon information that Defendant knew to be at least one to two years old. Aside from the obvious staleness of this information, the Michigan economy in 2006 through 2007 certainly would lead anyone to conclude that real estate values in 2005 or 2006 were simply not true in August, 2007. The fact that Defendant was an experienced real estate developer and had a degree in accounting, as well as a former member of Plaintiff's board of directors, certainly added awareness of Defendant that the information that he relied upon was not true.

The failure to list the Greektown Casino debt does not even require such an exercise of judgment. It is clear from the testimony that Defendant owed the Greektown Casino at least $70,000 as of December, 2005, and he had only paid this obligation down to $65,500 by the time the August, 2007, personal financial statement was tendered to Plaintiff. The complete failure to note this obligation renders the August, 2007, personal financial statement materially false for purposes of the 11 U.S.C. § 523(a)(2)(B) analysis.

12

08-03096-dof   Doc 113   Filed 09/30/10   Entered 09/30/10 15:36:38   Page 12 of 14

Turning to the reasonable reliance upon the August, 2007, personal financial statement, the Court concludes that while Plaintiff is certainly correct that the values listed in the August, 2007, personal financial statement as to the real estate are incorrect given the fluid nature of real estate values in Michigan from 2005 through 2007, the reasonable reliance by Plaintiff upon these numbers is not as clear. First, although Defendant certainly had market information available to him to question whether the values placed in the August, 2007, personal financial statement were accurate, the same is also true as to Plaintiff. In particular, Plaintiff, by observing the general decline of real estate from its perspective, certainly should have taken Defendant's statements of value with skepticism. This is particularly true given Mr. Grill's skeptical view of Defendant's long term viability, as well as the ability of Plaintiff to double check the numbers and figures given to it and reach its own conclusion as to whether those estimates were correct. In fact, it appears to the Court that while Defendant was certainly persuasive to the point of having sufficient intent to mislead Plaintiff, Plaintiff was likewise more than willing to be misled by Defendant with the hope that Defendant would somehow turn matters around and continue making payments to Plaintiff. Defendant's failure to list his Greektown Casino obligation, however, is a different matter. Plaintiff was not afforded an opportunity to review and analyze this information. The lack of disclosure of this debt misled Plaintiff in regard to the forbearance of collection of debt as well as the renewal of the line of credit obligation.

The Court notes that the testimony of Mr. Langs clearly indicated that he relied upon information given to him by Defendant in regard to the extension of the maturity date of the line of credit. Likewise, Mr. Hendry testified that the Plaintiff relied on Defendant's July, 2007, personal financial statements in deciding to not act on an event of default for both the line of credit and the construction loans. The testimony of both witnesses clearly establishes the requisite reliance by

Defendant pursuant to 11 U.S.C. § 523(a)(2)(B) and *In re Martin, supra*.

The Court, therefore, concludes that the personal financial statement of Defendant submitted in August, 2007, was false as to the real estate values and the failure to disclose the Greektown Casino obligation. Plaintiff has shown reliance on that statement as to the $2,405,000 construction loan and the $500,000 line of credit. The Court concludes that the failure of the Defendant to disclose the Greektown Casino obligation is sufficient evidence to infer an intent to deceive and that Plaintiff has likewise met its burden of proof in regard to reliance as related to both obligations. Accordingly, the Court concludes that Plaintiff has met its burden of proof as to its 11 U.S.C. § 523(a)(2)(B) action against Defendant as to the $500,000 line of credit and the $2,405,000 construction loan. Plaintiff is entitled to a judgment against Defendant as to the $500,000 line of credit and the $2,405,000 construction loan.

## Conclusion

To conclude, the Court holds that Plaintiff is entitled to a judgment under 11 U.S.C. § 523(a)(2)(B) as to the $2,405,000 construction loan and the $500,000 line of credit extended by Plaintiff to J.M. Developments, Inc. and guaranteed by the Defendant. As the Court's conclusion of the 11 U.S.C. § 523(a)(2)(B) action is conclusive, the Court does not address the remaining allegations made by Plaintiff against Defendant.

Counsel for Plaintiff is directed to prepare a judgment consistent with this Opinion.

**Signed on September 30, 2010**

                                          **/s/ Daniel S. Opperman**
                                          **Daniel S. Opperman**
                                          **United States Bankruptcy Judge**